Michael J. Frevola (MJF 8359)
Christopher R. Nolan (CRN 4438)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
NORTH OFFSHORE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORTH OFFSHORE AS,<br><br>     Plaintiff,<br><br>  -against-<br><br>ROLV BERG DRIVE AS,<br><br>     Defendant. | 07 Civ. 3095 (SHS)<br><br>**AFFIRMATION OF<br>SVEIN HOEL PURSUANT TO<br>28 U.S.C. § 1746 IN SUPPORT<br>OF PLAINTIFF'S OPPOSITION<br>TO DEFENDANT'S MOTION<br>FOR COUNTERSECURITY** |

  I, SVEIN HOEL, hereby affirm as follows:

  1. I am the Managing Director of North Offshore AS, previously known by the name TFDS Offshore AS. Although certain events related below occurred while North Offshore was named TFDS Offshore AS, Plaintiff will use "North Offshore" throughout for ease of reference. The facts provided herein are based on my own personal knowledge.

  2. I am providing this affirmation in support of my company's opposition to a motion filed by Rolv Berg Drive AS ("RBD") for countersecurity in the above-captioned proceeding.



## THE CHARTER PARTIES

3.   My company entered into a time charter party with RDB on February 16, 2004 of the AHTS ALDOMA for a period of three years on the SUPPLYTIME 89 form (as amended). I annex as Exhibit 1 a true copy of the North Offshore/RBD time charter (the "Time Charter"). The term "AHTS" refers to the vessel's functions and uses in the offshore oil industry, namely acting as an Anchor Handling, Tug and Supply vessel.

4.   At the commencement of the Time Charter, my company entered into a separate "side agreement" with RBD dated March 5, 2004 that provided RBD with a possibility of extending the charter period of the ALDOMA in certain circumstances.  RBD's rights to extend the ALDOMA's charter under the side agreement, however, specifically were subject "to [North] Offshore securing further charter with the vessel's owner."  I annex as Exhibit 2 a true copy of the "side agreement" dated March 5, 2004.

5.   The ALDOMA's owner is Arktikmorneftegazrazvedka ("AMNGR"), a Russian company with offices in Murmansk, Russia.  My company had the ALDOMA under bareboat charter from AMNGR during the initial portion of the Time Charter.  My company entered into a renewed bareboat charter party with AMNGR for the ALDOMA commencing on March 6, 2006 for a period of 14 months until May 2007 on the SUPPLYTIME 89 form as suitably amended (the "Bareboat Charter").  The Bareboat Charter included 2 one year options.  I annex as Exhibit 3 a true copy of the Bareboat Charter (which is dated May 12, 2005).  The Bareboat Charter is dated ten months earlier than the commencement of that charter because RBD sought to induce AMNGR to breach its charter agreement with our company.  Ultimately, AMNGR agreed to perform the Bareboat Charter, but RBD's interference caused AMNGR to demand (and forced us to agree to) an increased daily rate of hire.

2



6. The Bareboat Charter had a rider provision entitled "Profit Split" that addressed the payment of charter hire above a certain base rate provided in the Bareboat Charter. The "Profit Split" provision entitled AMNGR to additional compensation above the agreed base rate, which additional compensation would be 50% of the hire amounts earned by the ALDOMA on sub-charter above the agreed base rate. This provision was designed to ensure that the Bareboat Charter would remain economically reasonable to AMNGR in a rising market for offshore supply vessels such as the ALDOMA. A true copy of the "Profit Split" provision is provided in Exhibit 3 as the final page of that document.

7. Together with the Bareboat Charter, my company and AMNGR entered into a "side agreement" dated May 12, 2005 (the same date as the Bareboat Charter). I annex as Exhibit 4 a true copy of the AMNGR/North Offshore "side agreement" dated May 12, 2005. That agreement specifically addressed North Offshore's Time Charter with RBD and provided that extensions of the Time Charter would not be given "without the prior written consent of the Owner [AMNGR]." It also provided that AMNGR's written approval of North Offshore's new charter parties was required where AMNGR's profits would fall beneath US$1,000 per day on its profit split with North Offshore.

8. RBD sought to charter the ALDOMA for additional time past May 2007. It is my understanding that RBD has claimed that the ALDOMA would have been used to fulfill a five year time charter that RBD claims that it entered with a company named Oil & Natural Gas Corp ("ONGC"). The ONGC invitation to tender, however, had several requirements that the ALDOMA could not fulfill, including being unable to perform anchor handling at the depth required in the ONGC tender (1200 meters). This specification was a significant requirement. Earlier this year, in April 2007, the AHTS BOURBON DOLPHIN attempted to pull an anchor



set at approximately 1100 meters, during which attempt the BOURBON DOLPHIN capsized and sank with a loss of over half her crew. The BOURBON DOLPHIN was a larger vessel than the ALDOMA and had a greater bollard pull capacity, but nevertheless sank attempting to perform an operation required by the ONGC tender. In my view, based on my 30 years of experience in the offshore supply vessel industry, the ALDOMA would not have satisfied the ONGC tender.

9. The ONGC tender also required a five year charter term. We could not offer RBD a five year term because we did not have the rights to the ALDOMA for that time period to sub-charter the ALDOMA to RBD.

## DISPUTES BETWEEN NORTH OFFSHORE AND RBD

10. During RBD's Time Charter of the ALDOMA, disputes arose between my company and RBD. We commenced an arbitration against RBD in Norway seeking crew costs and costs relating to crew changes arising from improper acts by RBD under the Time Charter.

11. On September 1, 2006, the Norwegian arbitration panel found in favor of my company and awarded us damages for a variety of actions taken by RBD or costs incurred by us, including but not limited to (a) RBD's unilateral deduction of charter hire for unsupported crew costs, and (b) North Offshore's expenses related to the replacement of the ALDOMA's crew.

12. The Norwegian arbitration panel subsequently issued a second award on April 13, 2007 for additional claims we made against RBD. We received additional damages for a variety of actions taken by RBD or costs incurred by us, including but not limited to (a) RBD's unilateral deduction of charter hire for an alleged off-hire event lasting 7.82 days which the panel held to be unjustified, (b) RBD's unilateral deduction of hire for maintenance days

despite the Time Charter providing that such days were to count as on-hire periods, and (c) RBD's continued improperly-documented and deducted crew costs for the period between April and December 2006.

13. Since the April 13, 2007 award, the Time Charter has expired. At the time of the expiration of the Time Charter and continuing to date, RBD has not paid the final hire payments for the ALDOMA, amounting to a total of US$748,521.00. In addition, the ALDOMA was not redelivered within the agreed redelivery range, and my company incurred US$154,190 in additional expenses (largely fuel costs) incurred as a result of this redelivery outside of the agreed redelivery range. From these claims, my company has deducted the amount of US$100,641.10 credited to RBD for the fuel remaining aboard the ALDOMA at the time of its redelivery, resulting in a net total principal claim of US$802,069.90.

14. In connection with our claims of US$802,069.90 against RBD, we requested that the same panel which issued the first two awards also decide these claims. In the event that the panel decided to not accept these claims, we also appointed an arbitrator on May 16, 2007 to arbitrate these claims against RBD. RBD did not appoint an arbitrator in response within the required time of 14 days. Last week, the panel from the previous awards decided not to accept jurisdiction over the remaining claims, therefore the newly appointed arbitrator will have jurisdiction over our claims of US$802,069.90 against RBD.

## NORTH OFFSHORE'S FINANCIAL CAPABILITIES

15. I understand that RBD has requested an order from the Court that my company post security on RBD's counterclaims in at least the amount of approximately US$469,000.00. As the information provided below will demonstrate, it would be impossible for my company to comply with that order.

5



16. North Offshore is not a large company. It is not publicly traded. It has only one office and has only myself and my business partner as the company personnel. It has a current bank account balance of approximately US$0. I annex as Exhibit 5 for the Court's review a Statement of Accounts Balance Sheet dated August 31, 2007 prepared by accounting personnel for my affiliate company, Troms Offshore AS, showing the company's assets and liabilities. Please note that the figures given are in Norwegian kroner, rather than U.S. dollars.

17. Because of the short time period given for our response to RBD's application for security, I was unable to get a certified independent accountant's confirmation of these figures, although we can obtain one for the Court if we are permitted several days to instruct the accountants and give them the opportunity to complete their review.

18. For the Court's guidance, I provide the following information regarding certain line items on the balance sheet. On page 1, the item "Other Operating Costs" in the amount of NK14,090,294 for 2007 in the first section (entitled Operating Revenues and Expenses) refers to a variety of items, the most significant of which are (a) bareboat hire for the ALDOMA (NK7,602,029); (b) administration expenses (NK571,971); (c) lube oil (NK478,374); (d) Vessel maintenance (NK891,141); (e) other administration expenses (lawyers etc.) (NK1,589,932); (f) traveling expenses (NK885,289); and (g) insurance (NK248,031). The specified items amount to more than NK12,000,000 of the total of NK14,090,294. I have attached as Exhibit 6 a true copy of the entire list of expenses comprising our operating costs, which is in Norwegian but provides a line item recitation of these expenses.

19. Turning to the immediately following section on page 1 (entitled Financial Income and Expenses), there is a line entry entitled "Other Financial Expenses" in the amount of NK586,487, which refers to (a) interest charges on open accounts payable in the amount of NK120,296 and (b) currency exchange loss dealing with the conversion of the U.S. dollar hire payments to Norwegian kroner in the amount of NK466,191.

20. Turning to page 2, in the first section (entitled Fixed Assets), there is a line item entitled "periodical maintenance" in the amount of NK7,239,342. This entry refers to the cost of the drydocking and repairs to the ALDOMA in order to keep it class-certified by Det Norske Veritas.

21. At the bottom of page 2, in the final section (entitled "Current Assets") the section entitled "other claims" refers to pre-paid expenses (mainly insurance) In that same section, for the "accounts receivable" amount of NK11,362,742, the claims against RBD (NK6.135.000) comprise over 50% of that amount.

22. On page 3, in the first section (entitled "Equity"), the line entry "other equity" refers to the earned equity from former years.

23. On page 3, in the second section (entitled "Liabilities"), the line entry "accounts payable" refers to debts owed to various suppliers/contractors (for example, the costs relating to the drydocking and repair of the ALDOMA in the amount of NK7,300,000). The "other short-term liabilities" line item refers to accrued expenses for which we have not yet received the invoices.

24. As my company's balance sheet shows, we have virtually no liquid assets by which we could post the security demanded by RBD's counterclaim. If the choice were given to

7



my company whether to post countersecurity or surrender our security against RBD, I would have to agree to surrendering our security against RBD. This is not because I wish to surrender that security, it is because posting security on RBD's claim is financially impossible for my company.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of October, 2007 at the office of North Offshore AS, Tromsø, Norway.

_____
SVEIN HOEL