Michael J. Frevola
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR PLAINTIFF
NORTH OFFSHORE AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NORTH OFFSHORE AS,

   Plaintiff,

  -against-

ROLV BERG DRIVE AS,

   Defendant.

07 Civ. 3095 (SHS)

## MEMORANDUM OF LAW OF NORTH OFFSHORE AS
## IN OPPOSITION TO THE MOTION OF ROLV BERG DRIVE AS
## FOR COUNTERSECURITY PURSUANT TO SUPPLEMENTAL RULE E(7)(a)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...................................................................................................2

    A. The Charter Parties.................................................................................................2

    B. RBD's Attempts to Re-Hire the ALDOMA ...........................................................3

    C. The Disputes Between North Offshore and RBD ...................................................7

    D. North Offshore's Financial Capabilities.................................................................8

ARGUMENT......................................................................................................................9

I.   Countersecurity is not Warranted Because RBD's Counterclaim Does Not Arise
    Out of the Same Transaction or Occurrence as the Claims of North Offshore,
    and, Thus, is Not a Compulsory Counterclaim..............................................................12

II.  Countersecurity is not Warranted Because RBD's Claim is Frivolous and
    Designed to Leverage North Offshore into Surrendering its Security............................15

III. Countersecurity is not Warranted Because North Offshore is Financially
    Unable to Post Security..................................................................................................19

CONCLUSION...................................................................................................................20

## TABLE OF AUTHORITIES

### CASES

*Afram Lines Int'l, Inc. v. M/V CAPETAN YIANNIS,*
  905 F.2d 347 (11th Cir. 1990) ........................................................................10, 11

*Boland Marine & Manufacturing Co. v. M/V BRIGHT FIELD,*
  97 Civ. 3097, 1999 WL 172940 (E.D. La. Mar. 26, 1999)....................................19

*Expert Diesel, Inc. v. Yacht FISHIN FOOL,*
  627 F. Supp. 432 (S.D. Fla. 1986) ......................................................................16

*Hercules Inc. v. Dynamic Export Corp.,*
  71 F.R.D. 101 (S.D.N.Y. 1976) ......................................................................13, 14

*Incas and Monterey Printing and Packaging, Ltd. v. M/V SANG JIN,*
  747 F.2d 958 (5th Cir. 1984), *cert. denied sub nom,*
  *Van Weelde Brother Shipping Ltd. v. I.N.C.A.S.,*
  371 U.S. 951 (1963)..............................................................................................12

*Keefe on Behalf of Keefe v. Shalala,*
  71 F.3d 1060 (2d Cir. 1995)..................................................................................10

*Pipeliners Local Union No. 798 v. Ellerd,*
  503 F.2d 1193 (10th Cir. 1974) ............................................................................14

*Reeve v. Am. Broad Cos., Inc.,*
  580 F. Supp. 84 (S.D.N.Y.), *aff'd,* 719 F.2d 602 (2d Cir. 1983) ............................14

*Result Shipping Co. v. Ferruzzi Trading USA Inc.,*
  56 F.3d 394 (2d Cir. 1995)........................................................................10, 11, 19

*Seaplus Line Co., Ltd. v. Bulkhandling Handymax AS,*
  409 F. Supp. 2d 316 (S.D.N.Y. 2005), *overruled on other grounds by*
  *Aqua Stoli Shipping Ltd. v. Gardner Smith Party Ltd.,* 460 F.3d 434 (2d Cir. 2006) .............12

*Sea-Terminals, Inc. v. Independent Container Lines,*
  89 Civ. 6931 (MBM), 1990 U.S. Dist. LEXIS 11561 (S.D.N.Y. Sept. 4, 1990)....................12

*Solomon v. Bruchhausen,*
  305 F.2d 941 (2d Cir. 1962), *cert. denied sub nom,*
  *Isbrandtsen v. Maximo,* 371 U.S. 951 (1963) .......................................................12

*Titan Navigation, Inc. v. Timsco, Inc.,*
  808 F.2d 400 (5th Cir. 1987) ......................................................................... *passim*

*Thomas v. Roach,*
    165 F.3d 137 (2d Cir. 1999)..................................................................................10

*Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA,*
    776 F. Supp. 1555 (S.D. Fla. 1991) ..............................................................10, 16

*United States v. Gigante,*
    39 F.3d 42 (2d Cir. 1994)...................................................................................10

*U.S. Maritime Services, Inc. v. Trade Ventures, Inc., No. CIV. A. 98-0499,*
    1998 WL. 388669 (E.D. La. July 8, 1998) ......................................................17, 18

*Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.,*
    263 U.S. 629 (1924)......................................................................................11, 20

*Ythan Ltd. v. Americas Bulk Transport Ltd.,*
    336 F. Supp. 2d 305 (S.D.N.Y. 2004).................................................................15

## FEDERAL RULES

Fed. R. Civ. P. 13(a) ................................................................................................12

Fed. R. Civ. P. Supp. R. E(7)(a) ........................................................................ *passim*

## MISCELLANEOUS

6 James W. Moore & Arthur R. Wright, *Federal Practice and Procedure* (1971).......................14

7A James W. Moore et al., *Federal Practice and Procedure* (2d ed. 1995) ...................................8

# 4828866_v1

## PRELIMINARY STATEMENT

The application of defendant Rolv Berg Drive AS ("RBD") for an order directing plaintiff North Offshore AS ("North Offshore") to post countersecurity on RBD's counterclaims presents the following issues for determination:

Rule E(7)(a) limits a countersecurity application to counterclaims arising from the same transaction or occurrence that is the subject of the original action. RBD's counterclaim alleges a breach of an option contract dated March 5, 2004, while North Offshore's claims are for unpaid charter hire and redelivery expenses under an agreement dated February 16, 2004. Should this Court order North Offshore to post countersecurity where RBD's counterclaim arises out of separate facts and a separate contract?

A Court has the discretion to deny a countersecurity application for cause shown, including where the counterclaim is frivolous or clearly lacking in merit. RBD has not filed any papers supporting its application, while North Offshore has submitted an affirmation from a third party that shows that RBD's extension option was precluded by a condition precedent. Should this Court order North Offshore to post countersecurity where RBD's underlying right to its option claim is refuted by a third party?

A Court has the discretion to deny a countersecurity application for cause shown, including where the plaintiff is financially unable to post countersecurity. North Offshore has submitted affirmation and documentary proof that it is unable to post countersecurity, in large part due to RBD's failure to pay the very hire payments and redelivery expenses at issue in this proceeding. Should this Court order North Offshore to post countersecurity where it is financially unable to do so and that inability largely is attributable to the party seeking countersecurity?

1

## STATEMENT OF FACTS

### A.    The Charter Parties

North Offshore entered into a time charter party with RDB on February 16, 2004 of the AHTS ALDOMA for a period of three years on the SUPPLYTIME 89 form (as amended) (the "Time Charter").  Affirmation of Svein Hoel dated October 1, 2007 ("Hoel Aff."), ¶ 3 & Ex. 1.[1] Shortly after the commencement of the Time Charter, North Offshore entered into a *separate* "side agreement" with RBD dated March 5, 2004 that provided RBD with a possibility of extending the charter period of the ALDOMA in certain circumstances.  *Id.* ¶ 4.  RBD's rights to extend the ALDOMA's charter under the side agreement, however, specifically were subject "to [North] Offshore securing further charter with the vessel's owner."  *Id.* & Ex. 2.

The ALDOMA's owner is Arktikmornefticazrazvedka ("AMNGR"), a Russian company with offices in Murmansk, Russia.  *Id.* ¶ 5.  North Offshore had the ALDOMA under bareboat charter from AMNGR during the initial portion of the Time Charter.  *Id.*  North Offshore entered into a renewed bareboat charter party with AMNGR for the ALDOMA commencing on March 6, 2006 for a period of 14 months until May 2007 on the SUPPLYTIME 89 form as suitably amended (the "Bareboat Charter").  *Id.* & Ex. 3; *see also* Affirmation of Oleg S. Mnatsakanyan dated October 1, 2007 ("Mnatsakanyan Aff."), ¶ 3 & Ex. 1.  The Bareboat Charter is dated ten months earlier than the commencement of that charter because RBD sought to induce AMNGR to breach its charter agreement with North Offshore.  Hoel Aff., ¶ 5.  Ultimately, AMNGR agreed to perform the Bareboat Charter, but RBD's interference caused AMNGR to demand (and forced North Offshore to agree to) an increased daily rate of hire.  *Id.*

---

[1]    The term "AHTS" before the ALDOMA's name refers to the vessel's functions and uses in the offshore oil industry, namely acting as an Anchor Handling, Tug and Supply vessel.  Hoel Aff., ¶ 3.

The Bareboat Charter had a rider provision entitled "Profit Split" that addressed the payment of charter hire above a certain base rate provided in the Bareboat Charter. *Id.* ¶ 6 & Ex. 3. The "Profit Split" provision entitled AMNGR to additional compensation above the agreed base rate, which additional compensation would be 50% of the hire amounts earned by the ALDOMA on sub-charter above the agreed base rate. *Id.* This provision was designed to ensure that the Bareboat Charter would remain economically reasonable to AMNGR in a rising market for offshore supply vessels such as the ALDOMA. *Id.*

The Bareboat Charter included 2 one year options. *Id.* ¶ 5. AMNGR specifically reserved the right to withhold these option years unless North Offshore increased the daily charter hire to AMNGR in an amount that reflected the present rates in the market. Mnatsakanyan Aff., ¶ 4. In a "side agreement" dated May 12, 2005 (the same date as the Bareboat Charter), North Offshore and AMNGR specifically addressed the RBD Time Charter of the ALDOMA and provided that extensions of the RBD Time Charter would not be given "without the prior written consent of the Owner [AMNGR]." Hoel Aff., ¶ 7 & Ex. 4 *Id.* It also provided that AMNGR's written approval of North Offshore's new charter parties was required where AMNGR's profits would fall beneath US$1,000 per day on its profit split with North Offshore. *Id.*

**B.    RBD's Attempts to Re-Hire the ALDOMA**

RBD sought to charter the ALDOMA for additional time past May 2007 to apparently seek to use the ALDOMA for a five year time charter with a company named Oil & Natural Gas Corp ("ONGC"). *Id.* ¶ 8; Mnatsakanyan Aff., ¶ 10. North Offshore, because of the limitations imposed by its agreements with the ALDOMA's owner AMNGR, could not grant to RBD the extension of the Time Charter.

3

One of the limitations was that the ONGC tender required a five year charter term. Hoel Aff., ¶ 9; Mnatsakanyan Aff., ¶ 11. North Offshore could not offer RBD a five year term because it only had two one year options with AMNGR to extend the Bareboat Charter. Hoel Aff., ¶ 9. In other words, even if other impediments were not present, North Offshore did not have the rights to the ALDOMA for that entire time period to sub-charter the ALDOMA to RBD. Furthermore, as made clear by the affirmation of the Director General of the ALDOMA's owner AMNGR, AMNGR refused to agree to the charter term proposed by RBD and such a term also would have had to been approved by the Russian government:

> The ONGC tender also required a five year charter term. ***We would not agree to such a charter term*** and, even if we were willing to agree, such a term also would have had to be approved by [the] Ministry of Natural Resources of [the]Russian Federation Federal Agency of Subsurface Use.

Mnatsakanyan Aff., ¶ 11 (emphasis added).

Another problem with the limitations imposed by the ALDOMA's owners was that AMNGR wanted to charter the ALDOMA for a substantially greater daily hire rate than proposed by RBD. *Id.* ¶¶ 8, 9 & Ex. 3. Because the Bareboat Charter contained a "profit split" provision regarding daily hire rates, AMNGR would be affected directly by the hire rate contained in North Offshore sub-charters. This is a reason why AMNGR maintained a right to refuse granting North Offshore the extension options under the Bareboat Charter. *See id.*

Nevertheless, RBD persisted in trying to charter the ALDOMA. Notwithstanding the existing charter between AMNGR and North Offshore, in November 2006 RBD's Norwegian lawyers contacted AMNGR's Norwegian lawyers to inquire regarding the terms of the ALDOMA's Bareboat Charter between AMNGR and North Offshore. Mnatsakanyan Aff., ¶ 5.

On January 8, 2007, AMNGR was contacted by RBD regarding "[h]ire of the offshore vessel MS Aldoma from AMNGR to Rolv Berg Drive when she is off-contract in April 2007."

4

*Id.* ¶ 6 & Ex. 2. On January 16, 2007, RBD's representatives met with AMNGR's representative in Murmansk, Russia seeking to hire the ALDOMA, in response to which AMNGR explained to the RBD representatives that the negotiations on the new contract for the ALDOMA would not commence until the expiration of the Bareboat Charter in 2009. *Id.* ¶ 7.

On January 29, 2007, AMNGR's Norwegian lawyers wrote to RBD's lawyers and made clear that AMNGR retained the right to refuse to grant North Offshore its option extensions unless North Offshore obtained a significant increase in the daily charter hire rate that RBD offered in the amount of US$9,000. *Id.* ¶ 8 & Ex. 3. In that correspondence, AMNGR's lawyers specifically addressed the requirements that North Offshore would have to fulfill in order to qualify for the extension option under the Bareboat Charter:

> Arktik [AMNGR] has concluded a C/P [charter party] with NO [North Offshore] for a period up to 5th May 2009, including two options on one year each. The C/P also include a right for Arktik 1) to refuse NO to extend existing agreements with sub-charterers [RBD] and 2) to refuse conclusion of new C/P or extension of C/P not giving Arktik a substantial increase in the charter hire (the sum of basic charter hire and part of profit split). ***NO will not receive such approval for a rate of USD 9.000 which is the rate in the conditional option included in the C/P between RBD and NO (we have recently received a copy of this C/P). The market rate is far above USD 9.000 and Arktik as owner is seeking arrangement giving the owner of the vessel a substantial part of the marke[t] rate.***

*Id.*, Ex. 3 (emphasis added).

The same correspondence from AMNGR's lawyers also responded to following inquiry from RBD: "[i]s there anything preventing RBD from exercising their option agreement with North [Offshore]?" In response, AMNGR's lawyers made clear that control of whether RBD could obtain their option period under the Time Charter was governed by whether the charter rates offered for the extension periods satisfied AMNGR's profit requirements:

> *Arktik [AMNGR] has the right to refuse NO [North Offshore] to extend the relation with RBD without any reason and Arktik has an all over right to refuse sub-charterers not giving Arktik a certain amount in a profit split regime. Arktik has not evaluated whether RBD should be accepted or not, but want NO to conclude a sub-charter agreement on market terms entitling Arktik a profit split in the option periods.*

*Id.* (emphasis added).

Other problems also existed with RBD's asserted intention to use the ALDOMA for the ONGC tender. The ONGC invitation to tender contained requirements that the ALDOMA could not fulfill, including (a) the ALDOMA could not perform anchor handling at the depth required in the ONGC tender (1200 meters), (b) the ALDOMA does not have a chain locker capacity that met the requirements in the ONGC tender, and, perhaps most importantly, (c) the ALDOMA does not have a dynamic positioning system required under the ONGC tender which would allow the Vessel to precisely maintain station at one location. *Id.* ¶ 10; *see also* Hoel Aff., ¶ 8.

The ALDOMA's inability to perform anchor handling at the depth required in the ONGC tender (1200 meters) also was a significant requirement. Hoel Aff., ¶ 8. Earlier this year, in April 2007, the AHTS BOURBON DOLPHIN attempted to pull an anchor set at approximately 1100 meters, during which attempt the BOURBON DOLPHIN capsized and sank with a loss of over half her crew. *Id.* The BOURBON DOLPHIN was a larger vessel than the ALDOMA and had a greater bollard pull capacity, but nevertheless sank attempting to perform an operation required by the ONGC tender. *Id.* The AHTS ALDOMA – an "Anchor Handling Tug Supply" vessel – simply did not satisfy fundamental requirements anchor handling requirements of the ONGC tender. *Id.*

6

C.    **The Disputes Between North Offshore and RBD**

During RBD's time charter of the ALDOMA, disputes arose between North Offshore and RBD. Hoel Aff., ¶ 10. North Offshore commenced an arbitration against RBD in Norway seeking crew costs and costs relating to crew changes arising from improper acts by RBD under the Time Charter. *Id.* On September 1, 2006, the Norwegian arbitration panel found in favor of North Offshore and awarded it damages for a variety of actions taken by RBD or costs incurred by North Offshore, including but not limited to (a) RBD's unilateral deduction of charter hire for unsupported crew costs, and (b) North Offshore's expenses related to the replacement of the ALDOMA's crew. *Id.* ¶ 11.

The Norwegian arbitration panel subsequently issued a second award on April 13, 2007 for additional claims made by North Offshore against RBD. *Id.* ¶ 12. North Offshore received additional damages for a variety of actions taken by RBD or costs incurred by North Offshore, including but not limited to (a) RBD's unilateral deduction of charter hire for an alleged off-hire event lasting 7.82 days which the panel held to be unjustified, (b) RBD's unilateral deduction of hire for maintenance days despite the time charter providing that such days were to count as on-hire periods, and (c) RBD's continued improperly-documented and deducted crew costs for the period between April and December 2006. *Id.*

Since the April 13, 2007 award, the Time Charter has expired. *Id.* ¶ 13. At the time of the expiration of the Time Charter and continuing to date, RBD has not paid the final hire payments for the ALDOMA, amounting to a total of US$748,521.00. *Id.* In addition, the ALDOMA was not redelivered within the agreed redelivery range, and North Offshore incurred US$154,190 in additional expenses (largely fuel costs) incurred as a result of this redelivery outside of the agreed redelivery range. *Id.* From these claims, North Offshore deducted the

amount of US$100,641.10 credited to RBD for the fuel remaining aboard the ALDOMA at the time of its redelivery, resulting in a net total principal claim of US$802,069.90. *Id.*

In connection with its claims of US$802,069.90 against RBD, North Offshore requested that the same panel which issued the first two awards also decide these claims. *Id.* ¶ 14. In case the panel did not accept jurisdiction, North Offshore also appointed an arbitrator on May 16, 2007 to arbitrate these claims against RBD. *Id.* RBD did not appoint an arbitrator in response within the required time of 14 days. *Id.* Last week, the panel from the previous awards decided not to accept jurisdiction over the remaining claims, therefore the newly appointed arbitrator will have jurisdiction over North Offshore's claims of US$802,069.90 against RBD. *Id.*

**D.    North Offshore's Financial Capabilities**

As described in detail in the Hoel Affirmation, it would be impossible for North Offshore to comply with an order directing the posting of countersecurity in an amount of any significance. Hoel Aff., ¶ 15. North Offshore is not a large company. *Id.* ¶ 16. It is not publicly traded. *Id.* It has only one office and two business partners as company personnel. *Id.* It has a current bank account balance of approximately US$0. *Id.*

As the accompanying current balance sheet attached to Mr. Hoel's affirmation shows, North Offshore has virtually no liquid assets by which it could post the countersecurity demanded by RBD's counterclaim. *Id.* ¶ 16. Ironically, one of the largest assets that North Offshore possesses is the outstanding hire and redelivery debts owed by RBD. *See id.* ¶ 21. If the choice were given to North Offshore whether to post countersecurity or surrender its security against RBD, North Offshore would be forced to agree to surrendering its security against RBD, not because that result is desirable, but because North Offshore's posting countersecurity on RBD's claim is financially impossible. *Id.* ¶ 24.

## ARGUMENT

RBD has not filed a supporting brief, but its Verified Answer and Counterclaim dated August 27, 2007, its letter to the Court of last week, and its correspondence with counsel for North Offshore of last week all indicate RBD's intention to request that this Court order North Offshore to post counter-security for RBD's counter-claims under Rule E(7)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. *See* Affidavit of Michael J. Frevola dated October 1, 2007, ¶¶ 3-4 & Exs. 1 & 2.

The sum total of RBD's initial "application" is set forth in its Verified Answer and Counterclaim dated August 27, 2007:

> 7.    RBD has a monetary claim in a sum as presently may be determined of at least $14 million issuing from the wrongful refusal to renew the Charter.
>
> 8.    RBD is also entitled to an award of interest and legal fees and costs in the Arbitration which it calculates as follows . . . TOTAL $16,235,900.
>
> 9.    RBD is therefore entitled to counter-security pursuant to Supplemental Rule E(7) in the sum of at least $16,235,900.
>
> *    *    *
>
> 11.    Under the terms of the Charter RBD had an option for an extension of the Charter upon its expiry, which it exercised.
>
> 12.    RBD, in turn, entered into a new contract with its previous sub-charterer Oil & Natural Gas Corp. ("ONGC") in respect of which it intended to use the vessel under the extended Charter.
>
> 13.    Plaintiff repudiated RBD's exercise of its renewal option and renewal of the Charter in breach of the Charter.
>
> 14.    Plaintiff's breach caused RBD damages including but not limited to the difference between rates upon which RBD would have "Sub-let" the vessel under the renewed Charter to ONGC of $7,400 per day over the five year back-to-back term or approximately $13,505,000.

Verified Answer and Counterclaim dated August 27, 2007, at 7-9, 11-14.

The allegations cited above are the total extent of RBD's "application." There are no supporting affidavits or declarations. There is no supporting legal brief. Under well-settled procedure, RBD cannot buttress its application through submissions accompanying its reply papers, but only can rebut arguments made by North Offshore. *See, e.g., Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (refusing to consider appellant's argument made for the first time in a reply brief because "[w]e need not consider this argument because it is raised for the first time in his reply brief.") (citing *Keefe on Behalf of Keefe v. Shalala*, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995); *United States v. Gigante*, 39 F.3d 42, 50 n.2 (2d Cir. 1994)). The allegations set forth above fall well short of substantiating a valid request for countersecurity under Rule E(7)(a).

Rule E(7)(a) provides in relevant part:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the same transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise.

Fed. R. Civ. P. Supp. R. E(7)(a).

While this rule's initial language makes it appear that the posting of countersecurity is mandatory whenever its conditions are satisfied, "the final clause of the quoted language makes clear that the trial court possesses broad discretion in deciding whether to order countersecurity under such conditions." *Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 399 (2d Cir. 1995) (citing *Afram Lines Int'l, Inc. v. M/V CAPETAN YIANNIS*, 905 F.2d 347, 349 (11th Cir. 1990); *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 403 (5th Cir. 1987); 7A JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ E.15, at E-756 (2d ed. 1995)).

While the purpose of Rule E(7)(a) is to permit a counterclaimant to likewise receive security in appropriate instances, countersecurity under Rule E(7)(a) is not appropriate where a

defendant asserts a frivolous counterclaim. *See, e.g., Result Shipping*, 56 F.3d at 400; *see also Titan Navigation*, 808 F.2d at 404; *Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA*, 776 F. Supp. 1555, 1558 (S.D. Fla. 1991). The posting of countersecurity likewise is not appropriate where the plaintiff is financially unable to post countersecurity. *Result Shipping*, 56 F.3d at 400 (citing *Titan Navigation*, 808 F.2d at 403-05; also citing *Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629, 632-36 (1924)). In each case, the court is to use its discretion to determine, based on a totality of the circumstances, whether the posting of countersecurity should be ordered. *Result Shipping*, 56 F.3d at 400 (quoting *Titan Navigation*, 808 F.2d at 404; citing *Afram Lines*, 905 F.2d at 349-50).

As shown by the supporting affirmations and documents and discussed below, RBD's countersecurity application should be denied because RBD's "counterclaim" does not qualify as a arising from the same transaction and occurrence. This prerequisite must be satisfied before any countersecurity application can be considered on its merits.

RBD's application also should be denied because its "counterclaim" is a manufactured artifice designed to place North Offshore in the very position warned against in numerous decisions. Where a plaintiff must choose between maintaining its security against the defendant at an untenable cost or having to surrender a right to what it otherwise would be entitled, courts routinely have refused to grant a defendant's countersecurity request. Here, in light of the baseless nature of RBD's claims, the leverage that RBD seeks to impose upon North Offshore to vacate North Offshore's attachment, and the minimal financial capabilities of North Offshore, it is respectfully submitted that the totality of the circumstances weighs heavily in North Offshore's favor and RBD's motion for countersecurity should be denied.

11

### POINT I

**COUNTERSECURITY IS NOT WARRANTED BECAUSE RBD'S COUNTERCLAIM DOES NOT ARISE OUT OF THE SAME TRANSACTION OR OCCURRENCE AS THE CLAIMS OF NORTH OFFSHORE AND, THUS, IS NOT A COMPULSORY COUNTERCLAIM**

Supplemental Rule E(7) is identical to Rule 13(a) of the Federal Rules of Civil Procedure in that it only permits countersecurity for counterclaims that are compulsory. *Sea-Terminals, Inc. v. Independent Container Lines,* 89 Civ. 6931 (MBM), 1990 U.S. Dist. LEXIS 11561, *5 (S.D.N.Y. Sept. 4, 1990). Accordingly, when determining whether a counterclaim arises "out of the same transaction or occurrence" under Rule E(7), courts will apply the test for compulsory counterclaims under Rule 13(a). *See Incas & Monterey Printing & Packaging, Ltd. v. M/V SANG JIN,* 747 F.2d 958, 964-65 (5th Cir. 1984), *cert. denied sub nom Van Weelde Brother Shipping Ltd. v. I.N.C.A.S.,* 471 U.S. 1117 (1985); *Solomon v. Bruchhausen,* 305 F.2d 941 (2d Cir. 1962), *cert. denied sub nom Isbrandtsen v. Maximo,* 371 U.S. 951 (1963); *Seaplus Line Co. v. Bulkhandling Handymax AS,* 409 F. Supp. 2d 316, 324 (S.D.N.Y. 2005) (stating that "counterclaims falling within the purview of Supplemental Rule E(7) are akin to compulsory counterclaims under Rule 13(a)"), *overruled on other grounds by Aqua Stoli Shipping Ltd. v. Gardner Smith Party Ltd.,* 460 F.3d 434, 445 (2d Cir. 2006).

RBD's purported counterclaim does not arise from the "same transaction or occurrence" as the claims of North Offshore. Hence, it is not a mandatory counterclaim entitled to countersecurity under Supplemental Rule E(7). RBD's counterclaim is based on a "side-agreement," that is a completely separate agreement from the Time Charter between North Offshore and RBD. Whereas the side agreement is dated March 5, 2004, the Time Charter is dated February 16, 2004. The Time Charter sets forth the rights and obligations of the parties with respect to the charter of the ALDOMA. The side agreement, if it is an enforceable

agreement at all, merely provides for a future and highly speculative "option" (i.e. "*should* Rolv Berg AS be granted extension. . .") to be exercised by RBD under certain specified and limited circumstances. *See* Hoel Aff., Ex. 2.

The side agreement itself states that an extension of time might be granted to "this contract *or new contracts*." *Id.* As is stated in the side agreement, "this contract" refers to "the 3 year contract with contract no. MR/MM/OFF.LGTS/CH/VESSELS//10(109)/2003" *between ONGC and RBD* – not the *Time Charter between North Offshore and RBD*. The fact that the side agreement refers to the ONGC contract is not surprising, because the Time Charter does contain its own extension option. That option, however, is set forth at Clause 10 on the cover page of the Time Charter and *allows a mere 15 days extension*. Hoel Aff., Ex. 1, Part I, Clause 10 (first page). Not only does the Time Charter contain its own extension provision, but also Part II, Clause 32 of the Time Charter contains a merger clause stating that the Time Charter constitutes "the entire agreement of the parties." *Id.*, Part II, Clause 32 (last page).

The Time Charter and the side agreement are clearly two separate contracts, hence two separate transactions. Therefore, RBD's counterclaim is not compulsory even under the liberal standard applied by numerous whereby counterclaims arising out of the same contract as the plaintiff's claim are found to be compulsory. *See, e.g., Hercules Inc. v. Dynamic Export Corp.,* 71 F.R.D. 101, 109 n.10 (S.D.N.Y. 1976) (collecting cases). Indeed, RBD's counterclaim fails to satisfy any of the standards suggested by most courts when considering the compulsory or permissive nature of specific counterclaims, which are as follows:

13

(1)  Are the issues of fact or law raised by the claim and counterclaim largely the same?;

(2)  Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?;

(3)  Is there any logical relation between the claim and counterclaim?; and

(4)  Would *res judicata* bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?

*Id.* (citing *Pipeliners Local Union No. 798 v. Ellerd,* 503 F.2d 1193, 1198-99 (10th Cir. 1974); 6 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1410, at 42 (1971)).  While the logical relation test is the most consistently applied standard, *id.,* RBD's counterclaim is permissive under any of the above standards.

Looking at the first two inquiries, RBD's counterclaim (for a breach of a purported charter extension) does not involve any issues of fact or law raised by North Offshore's claims, which involve non-payment of hire for the use of the ALDOMA and expenses associated with a failure to redeliver the ALDOMA within the agreed redelivery range.  Nor will there be an overlap of evidence, let alone a substantial overlap.  (In contrast, a counterclaim for overpayment of hire, for example, *would* qualify as compulsory).

Turning to the third inquiry, under the logical relation test applied in the Second Circuit and elsewhere, a court "must analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issue be resolved in one lawsuit."  *Reeve v. Am. Broad. Cos., Inc.,* 580 F. Supp. 84, 88 (S.D.N.Y.), *aff'd,* 719 F.2d 602 (2d Cir. 1983) (citation omitted).  Even though the charter party and the side-agreement are related in that the side-agreement arose out of a relationship created by the charter party, a claim for a speculative loss of profits due to a failed business option is not so logically

14

related to a claim for breach of a charter party and failure to pay charter hire as to be deemed compulsory. *See Hercules,* 71 F.R.D. at 109.

Under the fourth inquiry, RBD's counterclaim also fails because RBD would not be barred by *res judicata* from bringing its counterclaim in a subsequent suit in the absence of the compulsory counterclaim rule.

Accordingly, because RBD's counterclaim is not compulsory under *any* standard, its motion for countersecurity should be denied because RBD's claim fails to qualify under Rule E(7)(a).

## POINT II

### COUNTERSECURITY IS NOT WARRANTED BECAUSE RBD'S CLAIM IS FRIVOLOUS AND DESIGNED TO LEVERAGE NORTH OFFSHORE INTO SURRENDERING ITS SECURITY

Rule E(7)(a) should not be permitted to be employed like a bludgeon to eliminate the possibility of security for well-founded claims through the granting of countersecurity on a defendant's dubious counterclaims:

> [T]he court should not require countersecurity where the counterclaim is frivolous or so lacking in merit that the court can only conclude that the counterclaim was advanced solely to secure a negotiating advantage over the complainant.

*Titan Navigation*, 808 F.2d at 404. Accordingly, courts in a variety of circumstances have refused to order the posting of countersecurity where a counterclaim is frivolous, lacking in merit, or too speculative to be entitled to the normal presumption that countersecurity is appropriate. Several representative examples, discussed below, demonstrate how courts have addressed this issue.

In *Ythan Ltd. v. Americas Bulk Transport Ltd.*, 336 F. Supp. 2d 305 (S.D.N.Y. 2004), the defendant sought $4.4 million in countersecurity on a cargo indemnity claim. *Id.* at 309. In

15

denying that portion of the defendant's countersecurity request, the court ruled that the "highly contingent" nature of the defendant's claim made posting of such countersecurity inappropriate:

> I decline to require security on the cargo indemnity claim ($4,400,000) because the claim is highly contingent and Ythan has already posted security for claims brought directly by the cargo owners against it. ***The fact that a claim against Americas Bulk by the cargo owners for which Americas Bulk may seek to hold Ythan liable may not be entirely foreclosed does not mean that there is a serious prospect of such liability.***

*Id.* at 309 (emphasis added).

In *Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA*, 776 F. Supp. 1555 (S.D. Fla. 1991), the plaintiff arrested the defendant vessel in connection with its claims for repairs and necessaries. *Id.* at 1556. The defendant shipowner counterclaimed for damage to the vessel due to the plaintiff's negligence, breach of warranty, and breach of contract and applied to the court for countersecurity under Rule E(7). *Id.* at 1558. In its application, the defendant contended that the plain language of Rule E(7) required the plaintiff to post countersecurity. *Id.* The court disagreed and, after examining the facts surrounding defendant's purported "counterclaim," refused to order the posting of countersecurity:

> [Defendant] argues that the plain language of Rule E(7) requires Plaintiff to post a bond or other security on the Counterclaims filed in this action. The Court is not persuaded by Defendant's reasoning in this regard. Rule E(7) mandates the posting of countersecurity in the instant unless the Court, for cause shown, directs otherwise. In the present case, ***Defendants' authorized representative executed Plaintiff's Notice of Repairs Satisfactorily Completed, confirming that the repairs performed by Plaintiff to the Vessel had been satisfactorily completed. The Undersigned believes that this fact alone indicates that Defendants' Counterclaims may be frivolous, and constitutes sufficient cause shown to remove the presumption of countersecurity dictated by Rule E(7).*** The Court would like to note parenthetically that this preliminary determination of the nature of Defendants' Counterclaims is germane only to the instant determination of the posting of countersecurity. It in no way speaks to the merits of Defendants' Counterclaims and has no *res judicata* or collateral estoppel effect.

*Id.* (emphasis added).

In *Expert Diesel, Inc. v. Yacht FISHIN FOOL*, 627 F. Supp. 432 (S.D. Fla. 1986), the court refused to grant the defendants' request for countersecurity on counterclaims similar to those asserted by the defendant in *KAS CAMILLA*. *See id.* In so holding, it stated that "the court is reluctant to compel Plaintiff to post a bond in light of Defendants' damage claims of a general, rather than a precisely detailed, nature." *Id.* at 433.

In *U.S. Maritime Services, Inc. v. Trade Ventures, Inc.*, No. CIV. A. 98-0499, 1998 WL 388669 (E.D. La. July 8, 1998), the defendants counterclaimed (similar to RBD here) for damages arising out of an alleged lost charter party. *Id.* at \*2. In denying the defendants' motion for countersecurity, the court ruled that the counterclaim was too speculative and insufficiently supported to justify an order directing the posting of countersecurity:

> the defendants' claim for the alleged lost charter is too speculative to sustain an order for countersecurity. *Unlike plaintiff's claim which is based on past events reasonably able to be ascertained and quantified, defendants' losses due to a 'road not taken' cannot be so readily ascertained and quantified. The Baldwin affidavit is insufficient by itself to determine what the defendants estimated actual loss is after expenses and other items are deducted, even assuming the voyage would have occurred but for the plaintiff's alleged broken agreement.*

*Id.* (emphasis added).

Here, RBD has offered even less substance than the defendants in the cases cited above. RBD summarily contends that it has claims for over $16 million, but it does not produce any contracts, any witness statements, or any other proof that such a claim has any basis in reality. As the cases cited above make clear, general claims or unsupported allegations are not given a presumption of validity that a well-supported and documented claim is to receive.

The reasoning of the *U.S. Maritime Services* court, quoted in the preceding paragraph, appears especially appropriate in this case. Like the plaintiff in that case, North Offshore's claim

here is based on RBD's use of the ALDOMA for a specified period of time and RBD's failure to redeliver that vessel within the agreed redelivery range. North Offshore's claims all are based on events that already have occurred and consideration already rendered.

In contrast, just like the defendant's claim in *U.S. Maritime Services*, here RBD seeks security for claims looking five years into the future on the speculation of a charter on which it might have been able to employ the ALDOMA, ***and assuming the following facts which have been refuted by North Offshore's submissions***:

(1)   ALDOMA's registered owner would have agreed to the enterprise for the alleged price (which it clearly would not from paragraphs 8 and 9 and Exhibit 3 of the accompanying Mnatsakanyan Affirmation);

(2)   ALDOMA's registered owner would have agreed to the chartering of its vessel for five years (which it clearly would not from paragraph 11 of the accompanying Mnatsakanyan Affirmation);

(3)   The Russian government would have agreed to the proposed time charter (which is unknown); and

(4)   ALDOMA would have qualified for the ONGC tender (which it would not have because it lacked critical characteristics requested in the tender as discussed in paragraph 10 of the accompanying Mnatsakanyan Affirmation and paragraph 8 of the accompanying Hoel Affirmation).

Just like the defendants in *U.S. Maritime Services*, RBD's "claim for the alleged lost charter is too speculative to sustain an order for countersecurity. . . .[D]efendants' losses due to a 'road not taken' cannot be so readily ascertained and quantified." *Id.* In *U.S. Maritime Services*, the defendants' countersecurity application was denied even though the defendants submitted an

18

affidavit supporting their counterclaim. Here, RBD has not even submitted that minimal level of support. Accordingly, even assuming that RBD's claims are considered as falling within the same transaction and occurrence thus making a countersecurity application facially proper, RBD's claim is too unsupported and too speculative to warrant an order directing the posting of countersecurity.

### POINT III

### COUNTERSECURITY IS NOT WARRANTED BECAUSE NORTH OFFSHORE IS FINANCIALLY UNABLE TO POST SECURITY

Generally, "when a party is financially unable to post countersecurity, courts often dispense with the requirement of [Rule E(7)(a)]." *Titan Navigation*, 808 F.2d at 403 (citing cases); *accord Result Shipping*, 56 F.3d at 400 (Rule E(7) "is not intended to impose burdensome costs on a plaintiff that might prevent it from bringing suit"); *Afram Lines*, 905 F.2d at 350.

For example, in *Boland Marine & Manufacturing Co. v. M/V BRIGHT FIELD*, No. CIV. A. 97-3097, 1999 WL 172940 (E.D. La. Mar. 26, 1999), the district court held that the defendant had satisfied the elements of Rule E(7). *Id.* at *1. Nevertheless, in reviewing the position of the parties, the court refused to grant the countersecurity application despite prerequisites met where "the requested amount would leave plaintiffs at a distinct disadvantage by tying up a large portion of its resources." *Id.*

The Hoel Affirmation and the financial statement attached to that affirmation show that North Offshore similarly is a small entity without resources sufficient to post countersecurity, especially in the magnitude sought by RBD. Hoel Aff., ¶¶ 15-16, 24. Furthermore, a significant reason for North Offshore's lack of liquidity is because it has had to pay charter hire to AMNGR for the ALDOMA where it has not been paid in turn by RBD. *See id.* ¶ 21.

Under the well-settled precedent discussed in this section and the previous section, the Rule E(7)(a) inquiry is to be driven by principles of equity and fairness. Here, not only is North Offshore financially unable to post countersecurity, but that inability to post security has been caused by the very party now seeking to use the countersecurity rule to deprive North Offshore of its right to use a maritime attachment to secure its claim. This result is precisely the type that the drafters of Rule E(7)(a) contemplating in leaving in the "for cause" exception to the automatic provision of countersecurity, and thus leaving it within the Court's power to deny countersecurity where the equities favor such a denial. *See, e.g., Washington-Southern Nav. Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629, 631-39 (1924) (discussing predecessor to Rule E(7) under old Admiralty Rules and holding that an automatic granting of countersecurity without consideration of the circumstances was not the intention of the rule).

## CONCLUSION

Because RBD's claim is not based on the same transaction and occurrence, because RBD's claim is frivolous, general, speculative and/or clearly lacking in merit, and because North Offshore is incapable of posting the requested countersecurity because of RBD's own actions, this Court should deny RBD's motion for countersecurity in its entirety.

Dated: New York, New York
      October 1, 2007

                       HOLLAND & KNIGHT LLP

By:                     
            Michael J. Frevola
            Christopher R. Nolan
            195 Broadway
            New York, NY 10007-3189
            Tel:   (212) 513-3200
            Fax:  (212) 385-9010

            *Attorneys for Plaintiff*
            *North Offshore AS*